## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | ID. No. 1404021032 |
| | ) | |
| RUSSELL S. MONROE, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

On this 18th day of February, 2015, **IT IS ORDERED** as follows:

Defendant's Motion to Suppress is **DENIED**.


Jenna R. Milecki, Esq., and Joseph Grubb, Esq., Deputy Attorney Generals, Delaware Department of Justice, Wilmington, Delaware. Attorneys for State of Delaware.


Andrew G. Ahern, III, Esq., 1701 Market Street, Wilmington, Delaware, 19899. Attorney for Defendant.


**Scott, J.**

1

## Introduction

Before the Court is Defendant Russell Monroe's ("Defendant") Motion to Suppress, brought by counsel. Defendant argues that there the probation officers did not have reasonable grounds to conduct the administrative search. Defendant also argues that the nighttime search warrant was defective because of its timing and it was not supported by probable cause. The Court has reviewed the parties' submissions and held a suppression hearing. For the following reasons, the Defendant's Motion to Suppress is **DENIED.**

## Findings of Fact

On April 28, 2014, Probation Officers Scaramazza and White went to Defendant's residence at 319 Cobble Creek Curve in Newark, Delaware, to conduct a home visit. The purpose for the home visit on that occasion was to do a walk-through of the residence to determine where Defendant was sleeping, in addition to checking his GPS equipment. While Officer Scaramazza was knocking on the front door of the residence, Officer White observed movement in the front bedroom located on the second floor of the residence, and subsequently observed a light go off in that room. There was approximately a five minute delay between when the probation officers began knocking until Defendant answered the door.

Once Defendant answered the door and the officers entered the residence, the officers questioned Defendant about his delay in answering. Defendant initially indicated that he had been asleep on the couch in the living room. When

2

the officers confronted Defendant regarding the movement Officer White had observed on the second floor while they were knocking, Defendant then indicated he was actually using the upstairs bathroom instead of sleeping on the couch. Upon inspecting the living room, the officers observed piles of clothes, children's toys and what appeared to be garbage on the couch that Defendant said he was sleeping on. The officers concluded that Defendant was not sleeping on that couch or in that room, for purposes of the home visit. The officers were suspicious as to whether Defendant had been in the room upstairs or if there was another person in the residence. To resolve this conflict, the officers went upstairs to do a protective sweep for officer safety.

When the officers went upstairs, they found the door to the room in which they had previously seen movement and the light on, closed and locked. Defendant denied having been in the room prior to their arrival and indicated there were no other persons in the home. Further, Defendant indicated that he did not have a key to access the room. At this time, Defendant became aggressive and combative with the officers so the officers placed Defendant in handcuffs an escorted him downstairs.

Officer White went back upstairs to complete the protective sweep for officer safety and determine if any other individuals were in the residence. In checking the second floor, Officer White pushed open the unsecured door to a second bedroom, and was "hit in the face" by the odor of burnt marijuana. While

3

clearing that room, Officer White observed a bong located on a dresser next to the television, partially concealed by a gray bag.

Furthermore, Defendant would not allow his probation officer to access Defendant's phone, which was a violation of his probation conditions that state that Defendant is subject to a search of his living quarters and person at any time without a warrant. In refusing to allow access to his phone, Defendant stated "that's a violation of probation, take me now." This statement further raised both officers' suspicions because, based on their training and experience, they believed Defendant wanted them out of the residence. At this time, Officer Scaramazza contacted the Governor's Task Force ("GTF") to provide security and assist in the home visit, relaying all of the officers' observations and statements made by Defendant to Probation Officer David Tuohey.

While en route to the residence, Officer Tuohey contacted his supervisor, Robert Willoughby, relaying the information learned from Officer Scaramazza, including the observations of second floor before the officers entered the residence, Defendant's inconsistent statements, the locked bedroom, and the odor of marijuana and observation of drug paraphernalia within the residence. Based on that information, Officer Willoughby authorized the probation officers to conduct an administrative search of Defendant's residence. That information was also the basis for Officer Willoughby authorizing entry into the locked bedroom on the second floor.

4

Authorization to conduct an administrative search of the residence and to access the locked second floor bedroom had been acquired upon GTF arrival. Probation officers, along with Corporal Dudzinski of the Delaware State Police, went upstairs to the locked bedroom, where Cpl. Dudzinski defeated the lock on the door and entered the room along with Officer Tuohey to do a protective sweep for officer safety. Upon entering the locked bedroom, officers observed in plain view Defendant's identification and social security cards, photographs of Defendant, a letter written by Defendant for a modification of sentence, and a letter addressed to "Mr. Bun," which is a nickname of Defendant.

During the administrative search of the locked bedroom small rubber bands located under a mattress and several hundred dollars of United States currency were found. A subsequent K-9 "sniff" of the currency alerted for the presence of drugs. In the common areas of the residence, the following items were found: a Lexus car key and parking ticket for a Lexus, which matched the white 2002 Lexus 300 located outside the residence. While conducting an exterior inspection of the vehicle, the probation officers observed an open trap secret compartment in the Lexus. The K-9 also conducted an exterior "walk-around" and alerted for the presence of controlled substances in the vehicle.

In the early hours of April 29, 2014, Cpl. Dudzinski referenced the above items, discovered as a result of the administrative search by the probation officers, in his affidavit as probable cause for the nighttime search warrant for residence at

5

319 Cobble Creek Curve, Newark, Delaware and white Lexus 300. The nighttime warrant was issued by the Justice of the Peace Court 11, and executed at approximately 12:45AM by members of the GTF. The Court finds that the nighttime search warrant was properly granted and GTF officers notified prior to the search being executed.

Defendant was arrested and later indicted on charges of Aggravated Possession, Drug Dealing, Possession of Ammunition by a Person Prohibited, and Possession of Drug Paraphernalia.

## Parties Contentions

The Defendant seeks to have all evidence seized as a result of the administrative and nighttime searches of his residence and vehicle suppressed on the grounds that the administrative search and nighttime search warrant were defective, and violated his Fourth Amendment rights.

Defendant argues that authorization of the administrative search because Officer Tuohey initiated a search beyond the scope allowed under and administrative search and without supervisor approval, as required by Department of Corrections procedure. Specifically, Defendant argues that the bong found in the second bedroom by Officer Tuohey should be excluded from consideration when evaluating whether there were reasonable grounds for the administrative search because there was nothing to indicate that Defendant exercised control over that room. In other words, without supervisor approval, Officer Tuohey was not

6

permitted to search that room and the bong cannot properly be considered for establishing reasonable grounds for the administrative search. Defendant asserts that without considering the bong, the Court is left with minimal facts that could reasonably support suspicion of unlawful activity: (1) Defendant was slow to answer the door but he provided a reasonable explanation, and (2) the door to the bedroom that was not his was locked and Defendant did not have a key. Approval for the administrative search was given before the officers gained entry to the locked bedroom. Therefore, nothing found inside the locked bedroom may be considered for establishing reasonable grounds for the administrative search. Finally, Defendant argues that the execution of the administrative search substantially violated DOC Procedure 7.19 because there was no pre-approved arrest/search checklist, and the officers completed their paperwork subsequent to the search later than "one duty day" after the administrative search.

Defendant also argues that the nighttime search warrant is defective because it is not supported by probable cause. Specifically, the basis for probable cause referenced in the nighttime search warrant is the illegally seized items from the defective administrative search. Because the items illegally seized from the administrative search cannot be considered in the determination of probable cause for the search warrant, the remaining grounds referenced in the affidavit are not sufficient to show probable cause. Therefore, the nighttime search warrant was

7

defective. Moreover, nighttime search warrants require a showing of exigent circumstances, which Defendant argues were not shown in this case.

The State argues that the administrative search of Defendant's residence is valid because it there were reasonable grounds for the probation officers to be granted verbal authorization for a warrantless search. There were reasonable grounds for authorization of the administrative search based on: the drug paraphernalia (i.e. the bong) in the second bedroom, the odor of marijuana coming from the second bedroom, the officers' observations on the second floor while knocking, Defendant's delay in answering the door and his inconsistent statements, the locked bedroom, and Defendant's refusal to allow the officers to look at his phone. Moreover, Officers Scaramazza and White's additional knowledge of Defendant regarding his prior convictions for drug distribution and weapons charges, and their training and experience as to the activity of an offender indicating the offender might possess contraband, the sudden change in Defendant's demeanor when brought upstairs, and Defendant's statement to "just take [him] now" were additional considerations for evaluating reasonable grounds for authorizing the administrative search.

The State also contends that the administrative search was not defective because it substantially complied with DOC Probation and Parole guidelines. As stated above, there were reasonable grounds to justify the verbal authorization of a warrantless administrative search, and therefore an arrest/search checklist was not

8

necessary. Further, the officers substantially complied with DOC guidelines in completing their reports subsequent to the administrative search. Therefore, the administrative search was properly executed and supported by reasonable grounds.

The State contends that the nighttime search warrant is valid because it is supported by probable cause and the items seized as a result of the administrative search are properly considered. Moreover, exigent circumstances to justify the need for a nighttime search were shown by the affidavit's reference to the officer's training and experience in paragraph 18 and specifically, the officers' observations of the individual who, upon his arrival at the residence, made several phone calls in the presence of DSP officers informing other individuals of the police presence at 319 Cobble Creek Curve. Therefore, the affidavit articulated sufficient probable cause and the exigency of preventing the removal or destruction of potentially incriminating evidence from that location.

## Discussion

### I. Administrative Search

Probationers do not enjoy the same liberties as ordinary citizens.[1] However, they do not surrender all of their privacy rights, and searches can only be conducted by probation officers when they have a reasonable basis to do so.[2] Restrictions on warrantless searches are relaxed due to the State's special interest

---

[1] *Sierra v. State*, 958 A.2d 825, 827 (Del. 2008).
[2] *Id.* at 832.

and the supervisory nature of probation.[3]   Delaware case law provides that warrantless searches of a probationer's residence are valid when the search is prompted by the probation officer's reasonable suspicion and is conducted in accordance with Department of Corrections ("DOC") procedure.[4]

Probation and Parole Procedure Section 7.19[5] of the DOC regulations provides the procedure and considerations for an officer to follow for a warrantless search of a probationer.   Absent exigent circumstances, the officer and his supervisor must hold a case conference using a search checklist as a guideline. Section 7.19 provides the factors to be considered when deciding whether to search:

> (1) Knowledge or sufficient reason to believe the offender possesses contraband.
> (2) Knowledge or sufficient reason to believe the offender is in violation of probation or parole.
> (3) Information from a reliable informant, indicating offender possesses contraband or is violating the law.
> (4) Information from the informant is corroborated.
> (5) Approval for the search had been obtained from a Supervisor.

Knowledge and reason to believe must be personal to the officer.[6]

---

[3] *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987).
[4] *State v. Reese*, 2010 WL 3707793, at *2 (Del. Super.); *State v. Watson*, 2009 WL 1228569, at *4 (Del. Super.).
[5] The legislative authority behind the Department's regulations is 11 Del. C. 4321(d), which states, in part:
> Probation and parole officers shall exercise the same powers as constables under the laws of this State and may conduct searches of individuals under probation and parole supervision in accordance with Department procedures while in the performance of the lawful duties of their employment . . . .
[6] *Id.*

10

The Delaware Supreme Court has held that officers are not required to follow each of the technical requirements under the Department regulations.[7] A warrantless administrative search of a probationer's residence is justified if the search "comported with the state regulation requiring that probationers be searched only for reasonable grounds."[8] Therefore, the officers must have "reasonable suspicion" or "reasonable grounds" for the search.[9] "Reasonable suspicion exists where the totality of the circumstances indicates that the officer had a particularized and objective basis for suspecting legal wrongdoing."[10] In *Pendleton v. State*,[11] the Delaware Supreme Court reiterated that Delaware precedent only requires substantial compliance with the department regulations and upheld a search when the Officer phoned his supervisor and they orally analyzed the information gathered, despite the checklist not physically being filled out. In other words, so long as the probation officers substantially comply with DOC regulations and have reasonable suspicion to search a probationer's dwelling, the search will be valid.[12]

---

[7] *Fuller v. State*, 844 A.2d 290, 292 (Del. 2004).

[8] *Fuller v. State*, 844 A.2d 290, 292 (Del. 2004). Similarly, the United States Supreme Court has held that "a warrantless administrative search of probationer's residence requires the probation officer to have "reasonable suspicion" or "reasonable grounds for the search." *Sierra*, 958 A.2d at 827 (citing *Griffin v. Wisconsin*, 483 U.S. 868, 872-73 (1987). *See also*, *Donald v. State*, 903 A.2d 315, 318-19 (Del. 2006).

[9] *Sierra*, 958 A.2d at 827.

[10] *Id.*

[11] 2010 WL 625826 (Del. Feb. 23, 2010).

[12] *Sierra v. State*, 958 A.2d 825, 828 (Del. 2008); *Pendleton v. State*, 990 A.2d 417, 420 (Del. 2010).

The scope of an administrative search should be limited to the areas of the residence that are actually occupied by the probationer, including common areas, and the probationer's property.[13] This scope also extends to areas which the officer has reason to believe is owned, possessed, or controlled by the probationer, even if it later turns out that the area or item searched was in exclusive possession of a non-probationer.[14]

In this case, the administrative search was valid because the probation officers obtained verbal authorization from Supervisor Willoughby prior to conducting the search, which was properly executed and supported by reasonable grounds. Defendant's refusal to allow probation officers to search his phone, plus the drug paraphernalia and the odor of marijuana observed within the residence are enough to establish reasonable grounds for authorizing the administrative search of the residence. One factor demonstrating reasonable grounds is where the officer has sufficient reason to believe the offender is in violation of his probation.[15] Here, a condition of Defendant's probation was to allow his probation officer access to Defendant's phone upon request. Thus, Defendant's refusal to comply, particularly considered in conjunction with his statement that such refusal was a violation and to "just take me now," provided the officers with reasonable grounds for an administrative search. Other factors such as, Officers Scaramazza and

[13] *State v. Redden*, 2003 WL 22853419, *3 (Del. Super. Oct. 22, 2003).
[14] *State v. Tucker*, 2007 WL 1065134, *3 (Del. Super. Apr. 10, 2007).
[15] 11 *Del. C.* § 4321; *see King v. State*, 984 A.2d 1205, 1208 (Del. 2009).

White's knowledge of Defendant's prior convictions for drug distribution and weapons charges, as well as their training and experience as to the activity of an offender indicating the offender might possess contraband and Defendant's sudden change in demeanor when brought upstairs are additional considerations supporting reasonable grounds for the administrative search.

Moreover, the bong located in the second bedroom, and odor of marijuana emanating from that room, are properly considered in evaluating the reasonable grounds for the search. Defendant's mischaracterization of the events causes his argument for exclusion of the bong to fail. It was Officer White, not Officer Tuohey, who located the bong in the second bedroom. More importantly, prior authorization for entry into the second bedroom was not required, nor was it outside the scope of the officers' authority to search because Officer White was merely conducting a protective sweep of the residence for officer safety when he located the bong in the second bedroom. The officers had reasonable grounds to conduct a protective sweep of the residence for officer safety based on the conflicting information resulting from the officers' observations on the second floor while they were knocking, Defendant's statements that he was the only person in the residence and Defendant's assertion that he did not have access to the locked room.[16] A protective sweep for officer safety extends beyond only those

---

[16] *See State v. Hunter*, 2004 WL 2744513, *1 (Del. Super. Sept. 10, 2004) (The purpose for clearing the apartment was strictly to determine who was present in the dwelling for reasons of officer safety.

13

areas over which Defendant exercises control.[17]  It is irrelevant that Defendant did not exercise control over the second bedroom because the bong was located in plain view[18] pursuant to a valid protective sweep conduct by Officer White to determine whether any other persons were in the residence.  Therefore, the bong is properly considered in evaluating the reasonable grounds for the search because it was found as a result of a valid protective sweep for officer safety.

Furthermore, the locked bedroom was properly within the scope of the administrative search because the officers reasonably believed that Defendant exercised control over the locked bedroom based on the information available to they had at the time the administrative search was authorized.  The scope of the administrative search extends to areas that probation officers have reason to believe is controlled by the probationer.[19]  The officers had reason to believe Defendant exercised control over the locked room based on the light and movement observed in the locked bedroom while the officers were knocking on the door, the delay in Defendant opening the door to the residence, Defendant's inconsistent statements as to what he was doing during that delay and Defendant's denial that he had been in the room or that anyone else was in the residence.

There was no defect in the execution of the administrative search because the officers substantially complied with the procedures under 11 *Del. C.* § 4321

---

[17] *See Id.*

[18] Though the there was a plastic bag partially covering the bong, it was in plain view such that it was immediately recognizable and visible to Officer White by mere observation.

[19] *State v. Tucker*, 2007 WL 1065134, at *3 (Del. Super. Apr. 10, 2007).

14

and Probation and Parole Procedure No. 7.19. In this case, the probation officers alone conducted the administrative search of the locked bedroom and common areas of the residence without the assistance of the GTF officers. The State makes clear that only the probation officers conducted the administrative search and any "visual search" by the GTF officers does not constitute a search because they could have only located items in plain view. Moreover, the search did not require checklist completed prior to the search because it was unplanned.[20] Where a checklist is not filled out prior to an administrative search, the form must be filled out one "duty day" after the search. Supervisor Willoughby testified that a "duty day" does not necessarily mean the next day, depending on whether the officer is in the officer or in the field. Here, the Court finds that the report completed by Officer Scaramazza and the checklist completed by Officer Tuohey approximately three days after the administrative search substantially complied with DOC procedures.

## II. Nighttime Search Warrant

An affidavit of probable cause must contain the facts sufficient to establish probable cause within the four corners of the affidavit.[21] The facts set forth must be adequate "for a neutral judicial officer to form a reasonable belief that an offense has been committed and that seizable property would be found in a

---

[20] *See Pendleton*, 990 A.2d at 420; *King*, 984 A.2d at 1208-09.
[21] *Dorsey v. State*, 761 A.2d 807, 811 (Del. 2000) (citation omitted).

15

particular place or on a particular person."[22] Probable cause exists in the affidavit when there is "a logical nexus between the items sought and the place to be searched."[23] The nexus "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime."[24] The affidavit must be viewed under the totality of the circumstances as a whole.[25] "A determination of probable cause by the issuing magistrate will be paid great deference by a reviewing court and will not be invalidated by a hypertechnical, rather than a common sense, interpretation of the warrant affidavit."[26] Additionally, the affidavit of probable cause must be based on current, not stale information.[27]

Under Delaware law, individuals are afforded an even greater protection against the nighttime search of a home, even where a warrant is obtained.[28] Specifically, a search warrant in Delaware does not authorize the search of a dwelling at night "unless the judge, justice of the peace or magistrate is satisfied that it is necessary in order to prevent the escape or removal of the person of thing

---

[22] *Id.* (*citing* 11 *Del. C.* § 2306 which states in relevant part:

> It shall designate the house, place, conveyance or person to be searched and the owner or occupant thereof (if any), and shall describe the things or persons sought as particularly made or the offense committed by or in relation to the persons or things searched for, and shall state that the complainant suspects that such persons or things are concealed in the house, place, conveyance or person designated and shall recite the facts upon which such suspicion is founded.)

[23] *Id.*
[24] *State v. Ivins*, 2004 WL 1172351 (Del. Super.) (citations and internal quotations omitted).
[25] *Sisson v. State*, 903 A.2d 288, 297 (Del. 2006).
[26] *Jensen v. State*, 482 A.2d 105, 111 (Del. 1984) (citations omitted).
[27] *Sisson*, 903 A.2d at 297.
[28] 11 *Del. C.* § 2308.

to be searched for, and then the authority shall be expressly given in the warrant."[29] A nighttime search warrant is appropriate where executing said warrant at night is "'necessary' to prevent the removal or destruction of potentially incriminating evidence."[30] Thus, a nighttime search warrant requires a "showing of exigent circumstances which make it necessary to conduct the search at night."[31] There is, however, "no requirement that a nighttime warrant contain specific language so long as it expressly provides authority to conduct the search during the nighttime."[32]

In this case, the affidavit submitted in support of the nighttime search warrant articulated sufficient facts within its "four corners" to support probable cause for a nighttime search of the residence and the exigency of preventing the removal or destruction of potentially incriminating evidence from that location. The items seized as a result of the administrative search are properly considered in the facts supporting probable cause for the nighttime search warrant because, as discussed above, there was no defect in the administrative search of the residence. With all factors referenced in the affidavit properly considered, there was sufficient probable cause to issue the search warrant. Moreover, the GTF officers were properly notified of the authorization of the search warrant prior to executing the

---

[29] *Id.*
[30] *Jensen*, 482 A.2d at 112-13.
[31] *Hanna v. State*, 591 A.2d 158, 162 (Del. 1990).
[32] *Scott v. State*, 2007 WL 539650 (Del. 2007).

17

search. The Court is satisfied that the time stamp indicating the 12:55am Justice of the Peace time received is when the signed search warrant was docketed.

The exigency was articulated in paragraph 18 of the affidavit, that based on Cpl. Dudzinski's training and experience, he reasonably believed that if one member of this drug organization were arrested or detained by law-enforcement officers, other members of the organization would be immediately notified and would attempt to destroy, remove or conceal narcotics, contraband, assets and/or any evidence of drug activity from any of the vehicles, residences or drug stash locations known to members of the drug organization, not yet identified by investigators. The officer believed that evidence could be located in the residence that may lead investigators to other locations or vehicles controlled or influenced by Defendant, and that timely securing of such evidence was critical in preventing evidence from being removed or destroyed at other places not yet identified. Further, the officer articulated in the affidavit that an individual, who arrived at the residence subsequent to the entry into the locked bedroom, made several phone calls in the presence of a DSP officer informing other individuals of the police presence at 319 Cobble Creek Curve.

These factors, together with the items seized from the residence as a result of the administrative search, are sufficient to establish probable cause and exigency for a nighttime search warrant.

## Conclusion

For the aforementioned reasons, Defendant's Motion to Suppress is

**DENIED.**

**IT IS SO ORDERED.**

***/s/Calvin L. Scott***
**Judge Calvin L. Scott, Jr.**
