IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ERIC D. LLOYD, | § | |
| | § | |
| | § | |
| Defendant Below, Appellant, | § | No. 79, 2022 |
| | § | |
| | § | |
| v. | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | |
| | § | I.D. No. 2003012388(N) |
| | § | |
| Appellee. | § | |

Submitted: January 18, 2023
Decided: February 9, 2023

Before **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices.

On appeal from the Superior Court. **AFFIRMED**.

Santino Ceccotti, Esquire, Office of the Public Defender, Wilmington, Delaware for the Appellant.

Matthew C. Bloom, Esquire, Delaware Department of Justice, Wilmington, Delaware for the Appellee.

**VALIHURA**, Justice:

In his direct appeal, Eric D. Lloyd ("Lloyd") argues that the trial court erred in denying his motion to suppress evidence obtained during an administrative search of his home. He asserts that the probation officer who authorized the search lacked exigent circumstances and failed to substantially comply with Department of Corrections ("DOC") Probation and Parole Procedure 7.19 ("Procedure 7.19"). We AFFIRM the denial of the motion to suppress and his subsequent conviction and sentence.

## I. Facts and Procedural Background[1]

On September 8, 2020, a Superior Court grand jury indicted Lloyd for Possession of a Firearm by a Person Prohibited ("PFBPP"), Possession of Ammunition by a Person Prohibited ("PABPP"), Possession of a Controlled Substance, Possession of Marijuana, and Operation of an Unregistered Motor Vehicle.[2]

On September 3, 2021, Lloyd filed a motion to suppress evidence obtained during an administrative search of his living quarters. The court denied the motion. Lloyd filed a motion for reargument, but the court, by order dated October 29, 2021, denied that motion. After a two-day jury trial commencing on November 2, 2021, Lloyd was convicted of the PFBPP and PABPP charges.[3]

The State successfully moved to have Lloyd sentenced as a habitual offender pursuant to 11 *Del. C.* § 4212(d). On March 4, 2022, Lloyd was sentenced to 30 years

---

[1] The facts, except as otherwise noted, are taken from the hearing transcript and the court's oral ruling denying the motion to suppress. *See* A19–43 (Suppression Hearing Transcript) [hereinafter Supp. Tran. at _].

[2] A9–11 (Indictment).

[3] The State *nolle prossed* the drug and traffic offenses.

incarceration at Level 5, followed by various levels of probation.[4]

On March 28, 2020, Senior Probation Officer Kevin McClure ("McClure") and two Wilmington police officers, Detectives Robert MacNamara ("MacNamara") and Sean Nolan ("Nolan"), were working together as part of Operation Safe Streets.[5] The officers were traveling on Spruce Street in Wilmington when they observed Lloyd operating a beige Honda with an expired registration.[6] Lloyd was the sole occupant. The officers conducted a traffic stop. McClure recognized Lloyd as a Level III probationer. Lloyd had a pending violation of probation for his involvement in a hit-and-run accident two months earlier. In addition, Lloyd had missed several curfews and had a positive urine screen the prior month. McClure approached the vehicle on the passenger's side and observed a marijuana cigar (a "blunt") in plain view in the center console ashtray.

Nolan and MacNamara ordered Lloyd out of the vehicle. Upon exiting the vehicle, Lloyd stated that the only thing he had on him was a blunt. When the door opened, McClure smelled a "powerful" odor of marijuana coming from the vehicle.

---

[4] For PFBPP, Lloyd was sentenced, as a habitual offender, to 25 years at Level 5, suspended after 15 years for two years and six months at decreasing levels of supervision. For PABPP, he was sentenced to five years at Level 5, suspended for two years at Level 3 probation.

[5] As noted in *Lum v. State*, "Operation Safe Streets is a 'crime reduction initiative that teams police with state probation and parole officers' to 'conduct unannounced curfew checks on probationers, surveil high crime areas, initiate investigations of probation violators and their associates, and follow-up on tips provided by informants.'" 193 A.3d 733, 2018 WL 4039898 at *1 n.1 (Del. Aug. 22, 2018) (ORDER) (quoting OPERATION SAFE STREETS/GOVERNOR'S TASK FORCE, ANNUAL REPORT 1 (2006), https://cjc.delaware.gov/wp-content/upload/sites/61/2017/06/05_OSS_GTF_Annual_Report-min.pdf.).

[6] *See* A21 (Kevin McClure Hearing Testimony at 4:14–18) [hereinafter McClure Test. at _].

Because Lloyd's possession of marijuana constituted a violation of his probation, McClure directed MacNamara to arrest Lloyd. MacNamara then searched Lloyd incident to that arrest and found heroin in Lloyd's underwear.[7] The heroin was packaged in baggies bound together with small, black rubber bands. The officers did not count them at the time for safety reasons.[8] There were no needles or empty baggies in the vehicle that might have indicated personal use or consumption.

McClure then decided to seek permission to conduct an administrative search of Lloyd's residence located at 2211 North Heald Street. After confirming with another resident that Lloyd lived there, McClure then called his supervisor, Operations Administrator Carlo Pini ("Pini"), and held a telephone case conference.

During the conference, McClure informed Pini about the traffic stop and the discovery of the heroin and marijuana. Together, they worked through the arrest/search checklist form.[9] McClure checked off every item on the list, except for "informants" because no informants were involved. Pini approved the search of the residence.

After receiving authorization, McClure searched the second-floor bedroom where Lloyd stayed. McClure found documents identifying Lloyd, a marijuana grinder, a black

---

[7] Seven bags of heroin weighing .049 grams were found. The marijuana cigar contained approximately .5 grams of marijuana.

[8] *See* A28 (McClure Test. at 31:1–4) ("[I]t's tactically unsound to unpackage that because of Fentanyl and actually being out on the street with all the environmental factors to actually count it[.]"). During the suppression hearing, McClure testified that "it looked like -- it was consistent with a bundle of heroin, a bundle being 13 bags of heroin." A22 (McClure Test. at 8:11–13). McClure later noted in his report "that it was seven bags." A28 (McClure Test. at 31:6–7).

[9] A23–24 (McClure Test. at 13:5–16:10). The checklist was admitted at the suppression hearing. *See* B15 (Arrest/Search Checklist).

4

and silver Smith & Wesson .38 caliber firearm loaded with five rounds of ammunition, and a box of .380-caliber ammunition. Lloyd was a person prohibited from possessing a firearm as a result of a prior felony conviction.

The Superior Court conducted an evidentiary suppression hearing on October 18, 2021. Lloyd's counsel first argued that there was no probable cause for Lloyd's arrest based on the odor of marijuana and the marijuana cigar. More specifically, he argued that Lloyd was arrested by the Wilmington police and that their arrest of Lloyd did not comply with our decision in *Juliano v. State*.[10] Lloyd's counsel did agree that smoking marijuana while on probation constitutes a violation of probation. The trial court pointed out that Operation Safe Streets is a joint operation. Lloyd's counsel argued that the State had the burden to confirm that Lloyd was arrested for violating his probation but that it did not meet that burden because only the probation officer and supervisor testified (as opposed to the Wilmington police officers).[11] Lloyd's counsel also argued that the search was unreasonable because the information concerning the number of bags of heroin found on Lloyd was inaccurate.

Following argument by each side, the Superior Court issued the following oral bench ruling:

---

[10] 260 A.3d 619 (Del. 2021). A number of facts distinguish this case from *Juliano*, including the fact that Lloyd was a known probationer and as a result, was prohibited from possessing and consuming marijuana as a condition of his probation. He was observed in the car with a partially burnt marijuana cigar in the ashtray and had made the unsolicited admission to the officers the only thing he had on him was the blunt. *See* A22 (McClure Test. at 7:10–11).

[11] *See* A40 (Supp. Tran. at 79:3–6). Nolan and MacNamara did not testify at the hearing.

The Court: The Court is duty-bound to deny suppression in this case. The PO [Probation Officer] and the Wilmington Police acting in Safe Streets and pursuant to Regulation 7.19, *United States v. Whren* and any other number of cases are permitted to pull the defendant over for driving with an expired tag. They are permitted to pull him out of the car when they smell of marijuana. And he admitted it was a blunt. He's not allowed to have a blunt. They knew he was on probation. Once they were permitted to pull him out of the car and arrest him for probation violation, which they said they did, Wilmington Police and the probation office was entitled to search him down pursuant to the lawful arrest. Upon finding the heroin in his underpants, it doesn't matter how much, they conducted a case conference with the supervisor as they are authorized to do under regulation 7.19. Pursuant to the regulation 7.19, they were authorized to go search his residence, and the search of his residence pursuant to the administrative search that was authorized recovered the handgun. There's nothing that I've heard today that would warrant suppression of the evidence.[12]

Lloyd filed a notice of appeal on March 10, 2022.

## II.    *Contentions on Appeal*

On appeal, Lloyd raises the sole issue of whether the trial court erred in denying the motion to suppress evidence obtained during the search of his home. He claims that his arrest and the subsequent searches failed to comply with DOC Procedure 7.19 and violated the United States and Delaware Constitutions. At the core of his argument is his contention that no exigent circumstances justified the officers' actions.[13]

---

[12] A43 (Supp. Tran. at 91:20–92:20).

[13] As set forth above, McClure did obtain supervisor approval, following a telephonic case conference, prior to the search of Lloyd's residence.

6

*III.    Analysis*

This Court reviews a trial court's "denial of a motion to suppress after an evidentiary hearing for [an] abuse of discretion."[14]  We consider legal questions *de novo* and will uphold a trial court's factual findings unless they are clearly erroneous.[15]

Lloyd first argues that exigent circumstances were required — but did not exist — for the officers to arrest Lloyd following the traffic stop.  The State contends that Section 4334(b) does not require probation officers to comply with DOC regulations before making a warrantless arrest.  However, it argues that to the extent compliance is required under the United States and Delaware Constitutions to establish the reasonableness of the warrantless arrest, the officers substantially complied with the regulations.

First, we address the different legal framework concerning probationers.  The special nature of probationary supervision, and the conditions imposed on the probationer under that supervisory relationship, justify a departure from the usual warrant and probable-cause requirements for searches.[16]  However, the search or seizure of a

---

[14] *Pendleton v. State*, 990 A.2d 417, 419 (Del. 2010) (internal citation omitted).

[15] *Rivera v. State*, 7 A.3d 961, 966 (Del. 2010) (internal citation omitted).

[16] *See Fuller v. State*, 844 A.2d 290, 292 (Del. 2004) (citing *Griffin v. Wisconsin*, 483 U.S. 868, 873–74 (1987)).  *See also Donald v. State*, 903 A.2d 315, 319 (Del. 2006) (stating that "[t]he special nature of probationary supervision justifies a departure from the usual warrant and probable cause requirements for searches, but a search of a probationer's home must be reasonable.") (internal citation omitted); *Griffin*, 483 U.S. at 875 ("These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large.") (internal citation omitted).

probationer must still be based on "reasonable grounds" or "reasonable suspicion" of criminal activity.[17]

Delaware statutory law governs the exercise of the power of probation officers to search and arrest probationers without a warrant. Probation officers, pursuant to 11 *Del. C.* § 4334(b), are authorized to arrest probationers, when in the officer's judgment, there has been a violation of any condition of probation.[18] Pursuant to Section 4321(d) of Title 11, probation officers "may conduct searches of individuals under probation and parole supervision in accordance with [DOC] procedures while in the performance of the lawful duties of their employment[.]"[19] The DOC promulgated Procedure 7.19 pursuant to Section 4321(d). Procedure 7.19 sets forth the guidelines for conducting administrative searches of probationers and their residences.[20] Procedure 7.19 also sets forth procedures

---

[17] *See Murray v. State*, 45 A.3d 670, 677–678 (Del. 2012) (stating further that "our law does not permit suspicionless probationer searches" and that "[a] probation officer must have a reasonable suspicion or reasonable grounds to justify an administrative search of a residence or car.") (internal citation omitted). *See also Arbolay v. State*, 262 A.3d 1034, 2021 WL 5232345, at *4 (Del. Sept. 14, 2021) (ORDER) (stating that "[a] probation officer may conduct a warrantless search as long as he has reasonable articulable suspicion of criminal activity" and noting that Procedure 7.19 "establishes the procedural requirements for administrative searches.") (internal citation omitted).

[18] *See* 11 *Del. C.* § 4334(b) (providing, in relevant part, that "[t]he Commissioner, or any probation officer, when in the Commissioner's or probation officer's judgment there has been a violation of any condition of probation or suspension of sentence, may arrest such probationer without a warrant, or may deputize any other officer with power of arrest to do so by giving that officer a written statement setting forth that the probationer has, in the judgment of the Commissioner or probation officer, violated the conditions of probation or suspended sentence."). *See also Miller v. State*, 653 A.2d 305, 1994 WL 679746, at *1 (Del. Nov. 30, 1994) (ORDER) ("[A] defendant may be arrested and detained on charges of violating probation based solely on the judgment of the probation officer that a violation has occurred.") (citing 11 *Del. C.* § 4334(b)).

[19] 11 *Del. C.* § 4321(d).

[20] *See* B4–5 (Procedure 7.19 at Part VII.A.6.a); B10–11 (Procedure 7.19 at Part VII.E). Part VII.6.a. provides:

for probation officers making arrests.[21]  It states that "[t]he Arrest-Search Checklist form

is to be used for all arrests and searches in the community, unless exigent circumstances

exist forcing the Officer into action."[22]

Before conducting an administrative search, a probation officer should discuss the

---

6. **SEARCH CHECKLIST**

   a. The Officer and Supervisor will hold a case conference using the Search Checklist as a guideline.  During the case conference the Supervisor will review the "Yes" or "No" responses of the Officer to the following search decision factors:

   (1)  Sufficient reason to believe the offender possesses contraband.

   (2)  Sufficient reason to believe the offender is in violation of probation/parole.

   (3) Information from a reliable informant, indicating offender possesses contraband or is violating the law.

   (4) Information from the informant is corroborated.

   (5)  Approval obtained from Supervisor, Manager, or Director.

B4–5 (Procedure 7.19 at Part VII.A.6.a)

[21] *See* B6–10 (Procedure 7.19 at Part VII.B–D).  Part VII.A.5.a. sets for the checklist for arrests and provides:

5. **ARREST CHECKLIST:**

   a. The Officer and Supervisor will hold a case conference using the Arrest Checklist as a guideline.  During the case conference the Supervisor will review the "Yes" and "No" responses of the Officer to the following arrest decision factors:

   (1) Reason exists to believe offender is engaged or about to engage in a clear and substantial risk to the community or their self.

   (2) An active warrant or capias exists.

   (3) Offender has a capias history.

   (4) Offender likely to abscond.

   (5) Other factors justifying the arrest (list).

B4 (Procedure 7.19 at Part VII.A.5.a.).

[22] *See* B3 (Procedure 7.19 at Part VII.A.1.).

matter with her supervisor, unless exigent circumstances exist.[23] During a "case conference[,]" the supervisor reviews the search decision factors listed on the search checklist.[24]

If the probation officer does not obtain supervisor approval prior to the search, she must list the exigent circumstances on the search checklist.[25] Administrative searches must be supported by reasonable suspicion to be in compliance with Procedure 7.19. As this Court stated in *Pendleton v. State*, "when a regulatory scheme requires reasonable grounds for a search, compliance with those regulations is sufficient to render the search reasonable under the Fourth Amendment."[26] We also stated that "probationers' and parolees' status curtails their rights[,]" and thus, "*substantial* compliance with departmental regulations is satisfactory evidence of reasonableness in Delaware."[27]

Here, the Wilmington police officers, MacNamara and Nolan, were authorized to

---

[23] *See* B10–11 (Procedure 7.19 at Part VII.E).

[24] As with searches, "[a]bsent exigent circumstances, the decision to arrest an offender should only be made after discussing the matter with [the] Supervisor, or in their absence, another unit Supervisor or follow the chain of command." B6 (Procedure 7.19 at Part VII.B).

[25] *See* B11 (Procedure 7.19 at Part VII.E.5).

[26] 990 A.2d at 420 (citing *Fuller*, 844 A.2d at 292). *See also Aiken v. State*, 173 A.3d 536, 2017 WL 4792211 at *4 (Oct. 23, 2017) (ORDER) ("When department guidelines require reasonable grounds for a search, a search is considered reasonable under the Fourth Amendment when those guidelines are complied with.") (internal citation omitted); *Murray*, 45 A.3d at 678 (stating that "this Court considers probation officers to have acted reasonably so long as they substantially comply with Delaware Department of Corrections regulations.") (internal citation omitted); *Griffin*, 483 U.S. at, 880 (noting that a state's operation of a probation system presents special needs beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements and holding that the search of the probationer's home was reasonable within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers).

[27] *Pendleton*, 990 A.2d at 420 (emphasis in original).

conduct a traffic stop after they observed Lloyd's beige Honda being operated with an expired registration. At that point, they had reasonable suspicion to investigate the violation.[28] MacNamara and Nolan were authorized to detain the vehicle and its occupant for the traffic stop.[29]

Police officers "may order the driver or a passenger to exit the car after a valid traffic stop, and that order is not a 'seizure' under the Fourth Amendment."[30] After approaching the vehicle, McClure observed the marijuana cigar in plain view. The officers ordered Lloyd to exit. When Lloyd opened the door, the "powerful" odor of marijuana was detected, and Lloyd admitted to possessing the blunt.

Based upon these uncontested facts, McClure reasonably determined that Lloyd was violating a condition of his probation and directed MacNamara to arrest Lloyd.[31] In *Miller v. State*, this Court stated that "[a] defendant may be arrested and detained on charges of

---

[28] *See Gordon v. State*, 245 A.3d 499, 509 (Del. 2021) (reaffirming that reasonable suspicion is the standard by which motor vehicle stops are to be judged). *See also Howard v. State*, 931 A.2d 437, 2007 WL 2310001, at *2 (Del. Aug. 14, 2007) (ORDER) ("Traffic stops must be supported by reasonable suspicion of criminal activity.") (internal citation omitted).

[29] *See* 21 *Del. C*. § 802 (a "police officer is authorized to make an administrative stop for purposes of enforcing a civil traffic statute, upon a reasonable and articulable suspicion that a violation of such statute has occurred."). *See also* 11 *Del. C*. § 1902(a); 21 *Del. C*. § 2101(a); *Holden v. State*, 23 A.3d 843, 847 (Del. 2011) ("A police officer who observes a traffic violation has probable cause to stop the vehicle and its driver.") (citing *Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.")).

[30] *Loper v. State*, 8 A.3d 1169, 1174 (Del. 2010) (defendant was lawfully detained as a result of a valid traffic stop for speeding and was not subject to a "second seizure" when the police ordered him to exit the vehicle) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 107–11 (1977)).

[31] *See* A26 (McClure Test. at 26:17–23). *See also* 11 *Del. C*. § 4334(b); *Miller*, 1994 WL 679746, at *1.

11

violating probation based solely on the judgment of the probation officer that a violation has occurred."[32]

The State argues that to the extent compliance with Procedure 7.19 is deemed necessary to establish the reasonableness of the warrantless arrest, McClure substantially complied.[33] The parties' engagement on this issue centers on whether exigent circumstances were present. The State correctly points out that Section 4334(b) does not, by its terms, require compliance with DOC procedures to effect a warrantless arrest. Section 4334(b) stands in contrast to Section 4321(d) (authorizing searches of probationers and parolees) which does explicitly require compliance with DOC procedures.[34] Rather,

---

[32] 1994 WL 679746, at *1 (internal citation omitted).

[33] The State argues that "to the extent the United States and Delaware Constitutions require probation officers to abide by DOC regulations for a warrantless arrest to be considered 'reasonable' under the regulatory scheme, SPO McClure substantially complied with them." Ans. Br. at 18.

[34] We note further that 11 *Del. C.* § 1904(c) addresses the power of a "peace officer" to make a warrantless arrest upon a reasonable ground to believe that the person to be arrested has committed a new offense during a period of probation thereby violating a condition of probation. Section 1904(c) provides:

> (c) Notwithstanding any other provision of law to the contrary, an arrest by a peace officer without a warrant for violation of probation is lawful whenever the peace officer has a reasonable ground to believe that the person to be arrested has committed a new offense within or without the State during a period of probation and has thereby violated a condition of said probation imposed upon the person by a court of this State. A reasonable ground to believe that a person has committed a new offense may be based upon, but is not limited to, a finding of probable cause to issue a warrant for the new offense made by a neutral magistrate, an indictment returned by a grand jury for the new offense or an information for the new offense filed in any court.
>
> Any person arrested pursuant to the provisions of this subsection shall be processed in accordance with the provisions of § 1909 of this title, at which time bail shall be set on both the new offense and the violation of probation.

12

compliance with DOC procedures in the context of warrantless arrests of probationers is better viewed as a "best practice" or "safe harbor" to the extent questions of reasonableness are raised under the Delaware or United States Constitutions.[35]

As Lloyd does question the overall reasonableness of the officers' conduct,[36] we put that issue to rest by observing that the evidence supports a finding of exigent circumstances for the warrantless arrest of Lloyd.[37]  For example, McClure testified that Lloyd was operating a motor vehicle while in possession of marijuana, and he was concerned that Lloyd might be driving while impaired.  McClure also knew that Lloyd did not have a medical marijuana card.[38]  In distinguishing earlier events where Lloyd had a positive urine screen but was not searched, McClure testified:

> A.  Okay.  Again, this is -- we're talking about what happened that night. This is just -- that's a technical violation.  This is something where I looked

11 *Del. C.* § 1904(c).  Further, Superior Court Criminal Rule 32.1(a) requires that any person taken into custody for a violation of probation be taken "without unreasonable delay" before a magistrate or Superior Court judge for the setting of bail or for an adjudication of the violation.  Super. Ct. Crim. R. 32.1(a).

[35] The State agrees that "[g]enerally, probation officers should discuss arrest decisions with their supervisors before effectuating the arrest—unless exigent circumstances exist."  Ans. Br. at 20.

[36] For example, Lloyd contends that "the probation officer conducted an illegal arrest and search which did not comply with the reasonableness requirements of the U.S. and Delaware Constitutions."  Op. Br. at 2.

[37] Procedure 7.19 defines "exigent circumstances" as "[a]n unexpected or urgent event which did not allow an opportunity for prior planning, and which requires immediate action to achieve a successful resolution."  B1 (Procedure 7.19 at Part V).

[38] *See* A29 (McClure Test. at 36:12–15).  The Delaware General Assembly amended 16 *Del. C.* §§ 4701 and 4764 to decriminalize personal use quantities of marijuana.  Possession of personal use quantities now carries a civil penalty of $100.  *See* 16 *Del. C.* § 4701 (36); 16 *Del. C.* § 4764(c); 2015 Del. Laws Ch. 38 (H.B. 39).  However, it remains illegal to operate a vehicle while consuming or smoking marijuana.  *See* 16 *Del. C.* § 4764(d); *Valentine v. State*, 207 A.3d 166, 2019 WL 1178765, at *2 (Del. Mar. 12, 2019) (ORDER) ("Use or consumption of marijuana in a moving vehicle is a misdemeanor.") (citing 16 *Del. C.* § 4764(d)).

at it from a common sense standpoint and said this person's operating a motor vehicle after they've admitted to be driving or -- smoking marijuana. They have you know -- there's marijuana in plain view there and the person's also already violated their probation. So that is a decision that I made to make the arrest right then and there.

Q. Did he admit to smoking marijuana or did he just say he had a blunt on him?

A. At the time he said he had a blunt on him. But based upon him being the sole occupant of the vehicle and the car smelling like marijuana, I inferred that he was smoking marijuana in the vehicle, sir.[39]

Later in his testimony, McClure stated:

Q. If this was your arrest, couldn't you have then called supervisor -- I mean, Mr. Lloyd wasn't going anywhere. Couldn't you have called the supervisor?

. . .

A. Okay. Again, there was no preplanning. I didn't have -- I didn't know Mr. Lloyd was going to have heroin in his underwear or be smoking marijuana and driving a vehicle. There was no preplanning this. I had no idea I was going to contact Mr. Lloyd. That's the exigent -- the exigency of the circumstances that I found myself in. I wasn't going to release Mr. Lloyd and, you know, just let him drive away.[40]

Pini was also asked to explain the exigent circumstances and testified:

A. I believe they did a car stop, and there was expired tags, and he smelled of marijuana, obviously, and saw a cigarette -- marijuana cigarette in the ashtray. Therefore, he was arrested on the scene by Officer McClure for the violation status.[41]

---

[39] A29 (McClure Test. at 35:14–36:8).

[40] A31 (McClure Test. at 45:2–19).

[41] A33–34 (Carlo Pini Hearing Testimony at 54:23–55:5) [hereinafter Pini Test. at _]. Pini also testified that the fact that the "bundle" of heroin turned out to be seven bags would not have affected his decision to authorize the search. *See* A33 (Pini Test. at 53:7–15).

14

Further, Lloyd already had a pending violation for being involved in a hit-and-run accident two months earlier. It was reasonable to suspect Lloyd was engaged in, or about to engage in, conduct that could endanger other drivers, pedestrians, or himself by driving while impaired. In sum, although Section 4334(b) does not require compliance with DOC regulations, unlike Section 4321(d), McClure substantially complied with Procedure 7.19, thus putting to rest Lloyd's challenge to the reasonableness of the arrest.[42] We say McClure "substantially" complied because he did not identify the exigent circumstances on his checklist when he later reduced his decisions to writing.[43] However, all of the necessary facts supporting a finding of exigent circumstances were contained in his report.[44]

Once the officers lawfully arrested Lloyd, they were permitted to search his person without a warrant incident to that lawful arrest.[45] It was then that they found the heroin in his underwear.

At that point, McClure had reasonable suspicion to search Lloyd's home. Procedure 7.19 allows for a search of a probationer's "living quarters" if the probation officer: (i) "has

---

[42] *See Pendleton*, 990 A.2d at 420 ("[S]*ubstantial* compliance with departmental regulations is satisfactory evidence of reasonableness in Delaware") (emphasis in original).

[43] *See* A27 (McClure Test. at 30:1–2). *See, e.g.*, *Pendleton*, 990 A.2d at 420 (noting that "failure to complete the *technical requirement* [of Procedure 7.19] does not negate the importance of [the probation officer's] discussion of the five factors with [his supervisor]."). Although McClure did not label the circumstances as "exigent," he did document all of the relevant facts that form the basis for a finding of exigent circumstances. *See* B15 (Arrest/Search Checklist).

[44] *See* B15 (Arrest/Search Checklist).

[45] *See Aiken*, 2017 WL 4792211, at *3 (stating that "[a]lthough Aiken does not expressly attack the search of his person, we note that such search was lawful because it was made incident to his arrest for violating the terms of his probation" and that "[p]robable cause existed that he had violated his probation by failing to report to his probation officer when required.").

knowledge or sufficient reason to believe the offender possesses contraband"; or (ii) "has knowledge or sufficient reason to believe the offender is in violation of probation[.]"[46] McClure had observed Lloyd in possession of marijuana and heroin. McClure cleared the search of the residence first with his supervisor, Pini. Thus, the exigent circumstances requirement is not applicable in the context of the search of the residence. Our case law supports the conclusion that McClure had reasonable suspicion to search Lloyd's home.[47] The authorized residential search then led to the discovery of the firearm and ammunition that are the basis for Lloyd's PFBPP and PABPP convictions.[48]

---

[46] B10–11 (Procedure 7.19 at Part VII.E.1–2).

[47] *See King v. State*, 984 A.2d 1205, 1209 (Del. 2009) (observing that this Court has held that administrative searches of probationers' homes require only reasonable grounds and holding that the factors in King's case "combine to form a reasonable basis to suspect that King possessed contraband in violation of his probation."). *See also Jacklin v. State*, 16 A.3d 938, 2011 WL 809684, at *2 (Del. Mar. 8, 2011) (explaining that a warrantless administrative search of a probationer's home requires the probation officer to have reasonable suspicion for the search and that reasonable suspicion exists where the totality of the circumstances indicates that the officer had a particularized and objective basis for suspecting legal wrongdoing); *Sierra v. State*, 958 A.2d 825, 828 (Del. 2008) (a probation officer has reasonable suspicion to conduct a warrantless administrative search of a probationer's home "where the totality of the circumstances indicates that the officer had a particularized and objective basis for suspecting legal wrongdoing.") (internal quotation marks and citations omitted).

[48] Lloyd's nighttime search argument is waived. This argument was not presented to the trial court. *See* Del. Supr. Ct. R. 8. *See also Ortiz v. State*, 869 A.2d 285, 291 n.4 (Del. 2005) (stating that the proper presentation of an alleged violation of the Delaware Constitution should include a discussion and analysis of one or more of the following criteria: textual language, legislature history, pre-existing state law, structural differences, matters of particular state interest of local concern, state traditions, and public attitudes or other applicable criteria.). On appeal, there is a brief mention of Article 1, Section 6 of the Delaware Constitution in Lloyd's opening brief, but he does not connect that reference to the nighttime search. The State's position is that "neither Delaware precedent nor Procedure 7.19 require exigent circumstances for a nighttime administrative search." Ans. Br. at 25. *See also King*, 984 A.2d at 1209–10. Although we do not reach the issue, we observe that our Court, in *King*, said the following:

> King further contends that the Superior Court erred in denying his motion to suppress because the evidence was seized during a night time search. King cites

16

## IV. Conclusion

Based on the foregoing, we AFFIRM the denial of the motion to suppress and, as a result, we affirm Lloyd's conviction and sentence.

---

no Delaware precedent prohibiting such a search. Procedure 7.19 does not require exigent circumstances for a nighttime search, but does require completing the search checklist before the search. The search checklist that the probation officers completed states, "[i]f the time of arrest or search is after 10:00 p.m. and before 6:00 a.m., then reasons must be stated to justify a night time action."

984 A.2d at 1209–10 (internal citation omitted). The Court in *King* found that even assuming exigent circumstances were required, the record supported the Superior Court's finding of exigent circumstances. *Id*. at 1210.